**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

| | | |
|---|---|---|
| **MICHAEL ONYENZE** | * | Civil Action No.: |
| 2001 Homewood Avenue | * | |
| Baltimore, Maryland 21218 | * | |
| *Resident of Baltimore City* | * | |
| | * | |
| Plaintiff, | * | Collective Action Claim |
| | * | |
| ***Individually and on Behalf of All*** | * | |
| ***Similarly Situated Employees*** | * | |
| | * | |
| v. | * | <u>Jury Trial Requested</u> |
| | * | |
| **FIDELITY RESOURCES,** | * | |
| **INCORPORATED** | * | |
| 1045 Taylor Avenue | * | |
| Suite 206 | * | |
| Parkville, Maryland 21234 | * | |
| | * | |
| Serve:  Chris Duru | * | |
| 6505 Sanzo Road | * | |
| Apartment F | * | |
| Pikesville, Maryland 21209 | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**COMPLAINT FOR WAGES OWED**</u>

MICHAEL ONYENZE, Plaintiff, by and through his undersigned counsel and The Law

Offices of Peter T. Nicholl, hereby submits his Complaint against FIDELITY RESOURCES,

INCORPORATED, Defendant, to recover unpaid wages, liquidated damages, interest,

reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act

of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated

damages, interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law,

Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.* (hereinafter, "MWHL"); and unpaid wages,

interest, treble damages, reasonable attorneys' fees and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl., §§ 3-501, *et seq*. (hereinafter, "MWPCL"), and in support thereof, states as follows:

## INTRODUCTION AND BACKGROUND

Defendant provides community-based services to persons with special needs.  Many of these persons suffer from cognitive disabilities, mental illnesses, or other conditions which make it challenging for these individuals to fully care for themselves on their own.  Defendant's business centers on supplying home healthcare and supervisory care services to these persons. Defendant hired Plaintiff and other similarly situated employees to assist with these services.

Plaintiff and others similarly situated worked as caregivers for Defendant and performed the tasks generally associated with both support and direct care staff.  Plaintiff's and other caregivers' tasks primarily entailed monitoring the physical and mental condition of Defendant's clients.  Their duties also involved providing laundry and other household services.  Personal services such as bathing, dressing and grooming were other tasks that Plaintiff and other caregivers provided. Plaintiff and other caregivers would also routinely accompany their clients to medical appointments.

Defendant's clients needed care and supervision at all times, requiring Plaintiff and other similarly situated employees to work overnight shifts.  For safety reasons, Plaintiff and other caregivers were not permitted to sleep during their shifts.  Each shift was approximately nine (9) to twelve (12) hours.  Plaintiff and others would typically work six (6) to seven (7) shifts per week.  Consequently, Plaintiff and other caregivers consistently worked well over forty (40) hours each week.  Plaintiff and others routinely worked as many as sixty (60) to eighty (80)

hours weekly.  There were occasions when Plaintiff and others similarly situated worked even more.

Defendant failed to properly compensate Plaintiff and others similarly situated. Defendant refused to pay Plaintiff and other caregivers correctly for the hours they worked. Defendant was able to complete these illegal acts by not paying Plaintiff and others similarly situated overtime wages.  Plaintiff and others similarly situated failed to receive "time and a half" their regular rates of pay for hours worked over forty (40) in a given workweek.

It is Defendant's company policy not to compensate its employees for overtime, regardless of the fact that Plaintiff and others similarly situated consistently worked in excess of forty (40) hours each week.  Working these excessive hours did not impact the manner in which they were paid.  Plaintiff and other caregivers received their regular rate of pay for all hours worked.  They failed to receive any overtime compensation.

Through these unlawful practices, Defendant evaded the payment of wages owed to Plaintiff and others similarly situated.  This directly contravenes the standards set forth by the FLSA, MWHL and the MWPCL.  To date, Defendant is engaged in this unlawful activity.

## THE PARTIES

1.      Plaintiff Michael Onyenze (hereinafter, "Plaintiff") is an adult resident of Baltimore City, Maryland.

2.      Defendant Fidelity Resources Incorporated (hereinafter, "Defendant") is an incorporated non-profit business.  Defendant's principle office is in Baltimore County, Maryland.  Hereinafter, any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation either, explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency.  To the extent individual agents are

3

responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

3.      Defendant provides home healthcare services to persons with special needs. Defendant provides a range of care options to its clients.  This includes family support services and community supported living arrangements. Defendant also offers mental health, language impairment and neurological care.

4.      To implement its services, Defendant owns and operates large assisted living facilities throughout the state of Maryland.  Plaintiff and other caregivers' tasks were performed at these facilities.

5.      Due to the nature of its business, Defendant is subject to the FLSA, MWHL and the MWPCL.  Defendant's business meets the definition of a retail or service establishment.

6.      Defendant is subject to the FLSA, MWHL and the MWPCL.  Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

7.      At all times relevant to this Complaint, Plaintiff engaged in interstate commerce. This is based on the nature of the duties performed by Plaintiff as part of his employment with Defendant.

8.      Plaintiff worked for Defendant who, at all times throughout Plaintiff's employment, fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

9.      At all times relevant, Plaintiff and others similarly situated worked as non-exempt employees for Defendant.  The duties assigned to Plaintiff and all others similarly situated do not satisfy the duties tests contained within the exemptions specified in the FLSA, MWHL, or the MWPCL.

10.     From approximately January 1, 2011 until August 17, 2016, Plaintiff was employed with Defendant.  Plaintiff performed duties specific to providing supervisory care services.

11.     Plaintiff typically worked Monday through Sunday.  His duties were primarily performed at Defendant's Woodlawn facility.

12.     At all times relevant to this Complaint, Defendant controlled the administration of its business and set employee schedules, including those of Plaintiff and others similarly situated.

13.     Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiff and other similarly situated employees.

14.     Defendant possessed and exercised authority to determine the hours worked by Plaintiff and others similarly situated.

15.     Defendant had the authority to control Plaintiff's tasks and the tasks of others similarly situated.

16.     Defendant had and exercised the power and authority to change the course of Plaintiff's and other similarly situated employees' duties.

17.     Plaintiff and members of the putative class recognized Defendant's authority and obeyed Defendant's instructions.

18.     Defendant made all decisions relating to Plaintiff and other similarly situated employees' rates and methods of pay.

## JURISDICTION AND VENUE

19.     Original jurisdiction in this Honorable Court is expressly provided by FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

20.    Discretionary supplemental jurisdiction of Plaintiff's Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiff's federal claims are based.

21.    No reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

22.    Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.

23.    This Honorable Court has personal jurisdiction over Defendant as Defendant is a corporation incorporated under the laws of Maryland and Defendant conducts sufficient business within the forum state so as to constitute a submission to its laws.

**FACTUAL ALLEGATIONS FOR ALL CLAIMS**

24.    Defendant is in the business of providing rehabilitation to persons with special needs.  This consists of preparing individual behavioral treatment plans for those who suffer from mental illness and developmental disabilities.  These individuals are Defendant's clients, whom reside on Defendant's premises.  Defendant's purpose is to provide these individuals with the skills needed to function independently.

25.    In order to accomplish this goal, Defendant is charged with connecting clients with services in the community.  Defendant regularly maintains medical charts for purposes of

documenting a client's progress.  This includes ensuring that clients are compliant with their treatment programs and medication plans.

26.     Defendant is also responsible for tracking what services are provided to clients. Billing requirements necessitate that Defendant regularly submit invoices detailing these services to one or more government agency.

27.     Defendant hired Plaintiff and other similarly situated employees to assist with the services that it provides.

28.     Plaintiff and others similarly situated worked as caregivers.  Plaintiff and others performed supervisory duties relating to interactions with Defendant's clients. They were employed as support and direct care staff.

29.     Plaintiff and other caregivers' primary purpose was to ensure that Defendant's clients were able maintain their own lifestyles.  Their role was to assist clients with learning how to safely perform their daily activities on their own.

30.     Plaintiff and others similarly situated were also charged with monitoring a client's physical and mental condition.  Based on their progress, Plaintiff and others would direct clients on ways to become more independent in the community.  This required Plaintiff and other caregivers to enlist clients in different interest groups.

31.     Plaintiff and other similarly situated employees would also introduce clients to community sponsored services.  This was for the purpose of establishing various mechanisms that could be used by clients to maintain their mental and physical well-being.  Many of these services concerned career building and educational opportunities.  Exercise, dietary issues and personal hygiene were also the focus of these services.

32.     Through the use of various techniques, Plaintiff and other caregivers would teach clients how to care for themselves.  The techniques focused on the manner in which clients interacted with others, helping clients with building confidence and to function independently. The goal was to integrate Defendant's clients back to the general public.

33.     Plaintiff and other similarly situated employees would also assist clients with the maintenance of their homes.  This entailed basic housekeeping and laundry services.

34.     General cleaning tasks were also performed when needed, which could include washing dishes, mopping, vacuuming, or changing linens.

35.     Preparing and serving meals to clients was another routine task performed by Plaintiff and other caregivers.

36.     Plaintiff and other similarly situated employees had to ensure that a safe and healthy environment was maintained in a client's home.  Following prescribed security precautions and adhering to relevant federal and state safety standards was included with this responsibility.

37.     Plaintiff and others similarly situated would also run errands with clients.  This primarily consisted of shopping for food or other household items.

38.     Transporting and accompanying Defendant's clients to their medical appointments was another one of Plaintiff and other caregivers' regular duties.

39.     Plaintiff and others would also assist clients with various aspects of personal care, including bathing, dressing or grooming clients when needed.

40.     Plaintiff and others similarly situated were also charged with reminding patients to take their medications.

41.     While performing their daily tasks, Plaintiff and other similarly situated employees did not require any specialized training or advanced knowledge.

42.     Plaintiff and others similarly situated were not able to, nor did they, provide medical advice or diagnoses.

43.     Plaintiff and others similarly situated did not perform any analysis.

44.     Plaintiff and others did not interpret any information.

45.     Plaintiff and other similarly situated employees made no medical recommendations.

46.     Plaintiff and others similarly situated did not write any reports.

47.     Plaintiff and other caregivers satisfied the requirements of their job and adequately performed their duties to benefit Defendant, as well as the Defendant's clients.

48.     Plaintiff and other members of support and direct care staff performed their duties to the extent that was required by Defendant.

49.     The aforementioned duties were performed on Defendant's premises. Defendant's clients do not reside in private residences; rather, they live in Defendant's assisted living facilities.

50.     Defendant either owns or rents the units in which each of its clients reside. Defendant maintains complete control over these units.

51.     Plaintiff and others similarly situated were each assigned a client by Defendant. For the duration of his employment, Plaintiff was directed to provide care for the same client.

52.     Plaintiff's client was housed in one of Defendant's assisted living facilities.  At all times relevant, Plaintiff was instructed to perform his tasks at this facility.

53.     Plaintiff completed his tasks at the Gwynn Oak Apartments, located at 3045 Essex Road, Gwynn Oak, Maryland 21207.  For the duration of the relevant period, Defendant's client was housed at this apartment complex.

54.     Many of Defendant's clients live in these apartments.   Defendant maintains multiple units within the division.  Defendant leases the unit in which each of these clients reside.

55.     For the duration of Plaintiff's employment, Defendant maintained complete control regarding all aspects of its client's residence.  All communications with the leasing agent were directly with the Defendant, not the client.

56.     Defendant was responsible for paying the client's bills.  Plaintiff can recall seeing bills in the Defendant's name that were attributable to the unit in which the client was housed. This includes the electric bill and other costs associated with maintaining the client's well-being. The client's personal mail was also addressed to Defendant.

57.     For the entirety of his employment, Plaintiff worked as an hourly employee for Defendant.  Plaintiff received bi-weekly payments reflecting a pay rate of approximately eleven dollars and fifty cents ($11.50) per hour.   Plaintiff never received a raise.

58.     When his employment began, Defendant informed Plaintiff and others similarly situated that they were to work the overnight shift.  Plaintiff and other caregivers were advised that their schedules could vary.

59.     Defendant implemented a staggered schedule that Plaintiff and other caregivers had to follow.  Defendant established a shifting schedule in order to meet the needs of its clients.

60.     Each day, Plaintiff and others similarly situated typically began their shifts at different times.   The time that Plaintiff and others similarly situated reported to work could change on a weekly basis.   This was based on Defendant's staffing requirements.

61.     Plaintiff and other similarly situated employees typically worked six (6) shifts each week.  Each shift was approximately nine (9) to twelve (12) hours.

62.     Plaintiff and other caregivers were typically scheduled to work Monday through Saturday.  During many workweeks, Plaintiff and others similarly situated worked every day.

63.     Plaintiff often worked seven (7) shifts each week.   He was scheduled to work seven (7) shifts for the majority of his employment.

64.     At times, Plaintiff and other caregivers were required to report to work at 3:00 p.m.[1]  Prior to their arrival, Defendant's clients would attend a day program.  The programs were centered on a client's recovery and were often specific to developing employment skills.

65.     Defendant's clients would typically be released from their day program at approximately 3:00 p.m.   At that time, Defendant's clients were directed to return to their residence.   When scheduled to begin their shifts at 3:00 p.m., Plaintiff and other caregivers would already be present at the residence, waiting for their client's arrival.

66.     Upon meeting, Plaintiff and other caregivers would assist clients with their daily activities.   This often entailed transporting clients to medical appointments, in addition to partaking in leisure activities.  Accompanying clients to the movies and other social events was a regular requirement throughout Plaintiff and other caregivers' employment.

---

[1] When scheduled to work at 3:00 p.m., a caregiver's shift was typically supposed to end at 11:00 p.m. At this time, another one of Defendant's caretakers was supposed to report to the client's residence and relieve the caretaker whose shift started at 3:00 p.m.  However, understaffing often prevented this from occurring, requiring the caretaker that reported to work at 3:00p.m. to have to work straight through the night.

67.     Once the daily activities were completed, Plaintiff and other caregivers would take their clients to their homes.  This would usually occur early in the evening.

68.     Many of Defendant's caregivers were scheduled to work later shifts.   These caregivers were required to report to work after other similarly situated employees' shifts had ended.  Their purpose was to relieve caregivers that were scheduled to work earlier.

69.     For the majority of the relevant period, Plaintiff worked these later shifts. Plaintiff regularly reported to work at 7:00 p.m.  When required to report at 7:00 p.m., Plaintiff's and other caregivers' shifts were scheduled to end at 7:00 a.m.

70.     In approximately April of 2016, Plaintiff was required to report to work at 11:00 p.m. for a shift scheduled to end at 9:00 a.m.  During this period, other caregivers also routinely worked this shift.

71.     When scheduled to work these later shifts, Plaintiff and others similarly situated were required to report directly to their client's residence.  Again, these residences were facilities maintained by Defendant.

72.     While at the residence, it was Plaintiff and other caregivers' duty to ensure that the client was properly maintaining the facility.  During this part of their shift, Plaintiff and others similarly situated would oversee and assist Defendant's clients in their household activities.  This was for purposes of ensuring the client's safety.

73.     During this part of their shift, Plaintiff and others similarly situated would also perform many of the duties listed above, including cooking and cleaning.

74.     Toward the end of the evening, Plaintiff and others similarly situated would assist their clients with getting ready for bed.  Plaintiff and others would help their clients with bathing or other aspects of grooming when needed.

75.     Plaintiff and other caregivers closely monitored clients as they prepared for bed. This was to ensure that clients were implementing techniques to advance their personal hygiene.

76.     Once a client had gone to bed, Plaintiff and other caregivers were required to monitor their clients' sleep patterns.  These observations were aligned with a client's treatment plan.

77.     Plaintiff and other caregivers were required to stay up through the night. Their duties centered on attending to any late night needs of their clients.

78.     The disabilities suffered by the clients required that they be monitored at all times. Their mental capacity required the implementation of twenty-four (24) hour assistance.  These circumstances demanded that Plaintiff and other caregivers always remain alert.

79.     Defendant's agents frequently performed nighttime inspections.  This was to ensure that Plaintiff and other caregivers were alert.

80.     Since Defendant owned the facilities in which its clients were housed, the facilities were always accessible.  This enabled Defendant's agents to enter the facilities at random and inspect Plaintiff and other caregivers' performance.

81.     At the end of their scheduled shifts, Plaintiff and other caregivers had to ensure that their clients were awake.  Plaintiff and others similarly situated had to also make sure that the client was preparing him or herself for the day.  Plaintiff and others would assist in any way needed.  This often included helping a client dress.

82.     Once a client departed in the morning, Plaintiff and other caregivers' shifts would end.  If Plaintiff or another similarly situated employees' shift was supposed to end prior to when a client departed, their shifts would end only when another caregiver came in to relieve them.

83.     Plaintiff and others similar situated consistently worked six (6) shifts each week. There were also periods when Plaintiff and other caregivers worked a shift each day.  Working seven (7) shifts per week was routine.

84.     Due to the multiple shifts worked by Plaintiff and others similarly situated, they consistently worked well over forty (40) hours in a workweek.  During many pay-periods, Plaintiff and other caregivers regularly worked as many as sixty (60) to eighty (80) hours per week.  There were periods when Plaintiff's and other caregivers' schedules required that they work much more.

85.     In addition to their demanding schedules, understaffing also caused Plaintiff and other caregivers to work overtime regularly.  For the majority of Plaintiff's employment, there was a high turnover rate.  Due to the long hours and low pay, it was common for caregivers to terminate their employment after short periods.  This resulted in multiple periods in which Defendant's facilities were understaffed.  During these periods, the number of clients that Defendant provided care for did not change.  These conditions resulted in Plaintiff and others similarly situated having to work excessive overtime.

86.     Defendant's scheduling practices further impacted Plaintiff's and other caregivers' workday.  Oftentimes, Plaintiff and others similarly situated could only be relieved once other caregivers that were scheduled later in the day reported to work.  Understaffing consistently prevented Plaintiff and other caregivers from leaving work at their regular times. Many of the disabilities suffered by Defendant's clients made it impossible for them to be left alone.  Absent relief, Plaintiff and other similarly situated caregivers had to remain on the job.

87.     As a result of all the aforementioned circumstances, Plaintiff and others similarly situated consistently worked well over forty (40) hours each week.  However, Plaintiff and other caregivers were not properly compensated for these hours.

88.     It was Defendant's company policy to not pay overtime.  This was made clear to Plaintiff and other caregivers at the commencement of their employment.

89.     For the entirety of the relevant period, Plaintiff and other caregivers received the same hourly rate for all hours worked. Defendant refused to pay Plaintiff and others similarly situated any overtime wages.

90.     Consequently, Plaintiff and others were not compensated at a rate of "time and a half."  This occurred for the duration of their employment.

91.     There is no bona fide dispute that Plaintiff and other similarly situated employees are owed overtime wages for all hours worked over forty (40) in a workweek.

92.     The duties performed by Plaintiff and others similarly situated did not implicate any exemptions contained within the FLSA, MWHL, or the MWPCL.

93.     As caregivers, Plaintiff and other similarly situated employees' responsibilities did not require an advanced degree or specialized intellectual instructions.

94.     Plaintiff and others similarly situated retained no discretion in performing any of their assigned tasks.

95.     Defendant was well aware of the excessive hours that Plaintiff and other caregivers consistently worked.  In order to track their time, Defendant required that Plaintiff and others fill out bi-weekly timesheets.

96.     Plaintiff and others similarly situated submitted their timesheets regularly throughout their employment.  Those timesheets clearly documented the hours that Plaintiff and other caregivers worked each week.

97.     Defendant knew that Plaintiff and other caregivers customarily worked over forty (40) hours per week.

98.     Defendant suffered and/or permitted Plaintiff and other similarly situated employees to work these overtime hours.

99.     Defendant, acting without good faith, withheld these overtime wages, even after Plaintiff and others similarly situated inquired about the wages missing from their pay-checks.

100.    Throughout his employment, Plaintiff made consistent complaints in regard to his failure to receive overtime wages.  These complaints were typically made to Defendant's Chief Executive Officer (hereinafter, "CEO") Christiana Opara (hereinafter, "Opara").  It was Opara's routine practice to simply ignore these complaints.

101.    Consequently, on behalf of himself and all those similarly situated, Plaintiff seeks the wages to which he is entitled and other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

102.    Plaintiff and other similarly situated employees work or worked as caregivers for Defendant.  They were employed by Defendant as either support or direct care staff.

103.    The FLSA requires employers to compensate non-exempt employees such as Plaintiff and others similarly situated overtime wages for all hours worked over forty (40) within a workweek.

104.    Defendant knew that Plaintiff and similarly situated employees typically worked over forty (40) hours per week.

105.    Defendant suffered or permitted Plaintiff and other caregivers to work more than forty (40) hours per week.

106.    Defendant knew or should have known that Plaintiff and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

107.    Pursuant to the FLSA, Plaintiff commences this collective action against Defendant on behalf of himself and those similarly situated.

108.    Plaintiff demands damages reflecting an overtime rate of not less than one and a half (1.5) times his regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations.  Plaintiff makes these same demands on behalf of all members of the putative class.

109.    Plaintiff consents to be party plaintiff in this matter.  Plaintiff's consent form is attached to this Complaint as Exhibit A.

110.    It is likely that other individuals will join Plaintiff during the litigation of this matter and file written consents to "opt in" to this collective action.

111.    There are numerous similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its employees and violate the FLSA.

112.    These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

113.    Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

114.    Upon information and belief, others will choose to join Plaintiff in this action against Defendant and opt in to this lawsuit to recover unpaid wages and other available relief.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *Count I - Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiff and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff.*

115.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

116.    Plaintiff is entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

117.    As described above, Plaintiff has not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a workweek; Defendant failed to compensate Plaintiff for these additional hours.

118.    Defendant willfully and intentionally failed to compensate Plaintiff for the overtime wages he is owed.

119.    There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

120.    Under the FLSA, Plaintiff is entitled to additional wages from Defendant to compensate him for the hours he worked in excess of forty (40) in a workweek at a rate of one and one-half (1.5) times his regular hourly wage rate.

**_Count II.  Violation of MWHL: Failure to Pay Overtime Wages to Plaintiff and all those that are Joined as Party Plaintiff in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court_**

121.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

122.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

123.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

124.    Plaintiff has not received compensation from Defendant reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

125.    Defendant willfully and intentionally did not compensate Plaintiff for the overtime wages he is owed.

126.    There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

127.    Under MWHL, Plaintiff is entitled to additional wages from Defendant for all overtime hours worked at a rate of one and one-half (1.5) times his regular hourly wage rate.

**_Count III - Violation of the MWPCL: Failure to Pay Wages Owed at the Termination of Their Employment to Plaintiff and all those that are Joined as Party Plaintiff in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court._**

128.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

129.    Plaintiff is entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501 *et. seq*., which provides that each employer shall

pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

130.    Plaintiff has not received compensation from Defendant for all wages owed for work performed before the termination of his employment as required by Md. Code Ann., Lab. & Empl. §3-505(a).  This is specific to Defendant' failure to pay Plaintiff the overtime wages to which he is entitled.

131.    Defendant willfully and intentionally did not compensate Plaintiff for the wages owed to him and continued to violate the MWPCL, even after Plaintiff informed Defendant of the violation.

132.    Under the MWPCL, there is no bona fide dispute that Plaintiff is owed wages for work performed while employed by Defendant.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and others similarly situated, prays for the following relief:

a)    In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiff and those similarly situated;

b)    Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, and emails of all those individuals who are similarly situated and permitting Plaintiff to send notice of this action to all those similarly situated individuals;

c)    Designating the named Plaintiff to act as class representatives on behalf of all similarly situated employees for the FLSA collective class;

d)    Judgment against Defendant for their failure to pay Plaintiff, and those similarly situated, in accordance with the standards set forth by the FLSA;

e)      Judgment against Defendant for their failure to pay Plaintiff, and those appropriately joined to this matter, in accordance with the standards set forth by MWHL;

f)      Judgment against Defendant for their failure to pay Plaintiff, and those appropriately joined to this matter, in accordance with the standards set forth by the MWPCL;

g)      Judgment against Defendant and classifying its conduct as willful and not in good faith;

h)      Judgment against Defendant and classifying Plaintiff, the collective class, and those appropriately joined in this matter as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

i)      An award against Defendant for the amount of unpaid overtime wages owed to Plaintiff and those similarly situated, calculated at a rate that is not less than one and a half (1.5) times Plaintiff and other similarly situated employees' regular hourly rate for all overtime hours worked;

j)      An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiff and those similarly situated, whichever is deemed just and equitable by this Honorable Court;

k)      An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

l)      Leave to add additional Plaintiff to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

m)      All further relief deemed just and equitable by this Honorable Court.

## **REQUEST FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests that a jury of his peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,


*/s/ Benjamin L. Davis, III*
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorney for Plaintiff*